```
                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF DELAWARE


  UNITED THERAPEUTICS CORPORATION,)
                                  )
                Plaintiff,        )
                                  ) C.A. No. 20-755-RGA-JLH
  v.                              )
                                  ) Volume III
  LIQUIDIA TECHNOLOGIES, INC.,    )
                                  )
                Defendant.        )

                                    J. Caleb Boggs Courthouse
                                    844 North King Street
                                    Wilmington, Delaware

                                    Wednesday, March 30, 2022
                                    8:30 a.m.
                                    Bench Trial


  BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

  APPEARANCES:


             MORRIS NICHOLS ARSHT & TUNNELL LLP
             BY:  JACK B. BLUMENFELD, ESQUIRE
             BY:  MICHAEL J. FLYNN, ESQUIRE
             BY:  SARAH E. SIMONETTI, ESQUIRE

                      -and-

             GOODWIN PROCTER LLP
             BY:  WILLIAM C. JACKSON, ESQUIRE
             BY:  HUIYA WU, ESQUIRE
             BY:  IAN B. BROOKS, ESQUIRE
             BY:  JOEL BROUSSARD, ESQUIRE
             BY:  HARRISON GUNN, ESQUIRE
             BY:  ERIC LEVI, ESQUIRE


                      - and -
```

| | |
|---|---|
| 08:29:59 1 | I'm not sure exactly what the order is here, but |
| 08:30:03 2 | whoever is next, please do something. |
| 08:30:07 3 | MS. KIM: Good morning, Your Honor. Mandy Kim |
| 08:30:09 4 | on behalf of UT. And we call Dr. Waxman to the stand. |
| 08:34:32 5 | MR. FLYNN: Your Honor, may I approach? |
| 08:34:32 6 | THE COURT: Sure. |
| 08:34:32 7 | DEPUTY CLERK: Please state and spell your full |
| 08:34:32 8 | name for the record. |
| 08:34:32 9 | THE WITNESS: Aaron B. Waxman, A-A-R-O-N. |
| 08:34:32 10 | Middle initial B. Last name W-A-X-M-A-N. |
| 08:34:32 11 | DEPUTY CLERK: Do you affirm that the testimony |
| 08:34:32 12 | you are about to give to the Court in the case now pending |
| 08:34:32 13 | will be the truth, the whole truth, and nothing but the |
| 08:34:32 14 | truth, you do so affirm? |
| 08:34:32 15 | THE WITNESS: I do. |
| 08:34:32 16 | DEPUTY CLERK: Please speak in the microphone. |
| 08:34:32 17 | Please make sure you speak into it. |
| 08:34:32 18 | THE COURT: Thank you. |
| 08:34:32 19 | MS. KIM: May I proceed, Your Honor? |
| 08:34:32 20 | THE COURT: Yes. |
| 08:34:32 21 | DIRECT EXAMINATION |
| 08:34:32 22 | BY MS. KIM: |
| 08:34:32 23 | Q. Good morning, Dr. Waxman. Please introduce yourself |
| 08:34:32 24 | to the Court and what you do for a living. |
| 08:34:32 25 | A. My name is Aaron Waxman, and I'm a physician, |

```
09:46:32  1    blood vessels of the lung.
09:46:34  2    Q.    Okay.  And then if you could turn to Page 95.  You
09:46:40  3    were asked:  "Do all five categories of pulmonary
09:46:44  4    hypertension exhibit elevated blood pressure in the lungs?"
09:46:47  5              And what was your answer?
09:46:47  6    A.    That they are defined by an elevated blood pressure
09:46:52  7    in the lungs.
09:46:52  8    Q.    Thank you.
09:46:58  9              Just one -- a few more questions on
09:47:00 10    therapeutically effective single-event dose.  Counsel was
09:47:03 11    asking you if there's anything in the Yutrepia label that
09:47:08 12    says that you do it once a day.  Do you recall that?
09:47:10 13    A.    Yes.
09:47:11 14    Q.    And he pointed you specifically to the language that
09:47:13 15    said three to five times?
09:47:14 16    A.    Yes.
09:47:16 17    Q.    Is there anything in the patent that says such a dose
09:47:19 18    has to be given only once per day?
09:47:21 19    A.    No.
09:47:22 20    Q.    If we could put up Claim 1 of the '793 patent.  Is
09:47:36 21    there anything in Claim 1 that requires that the
09:47:38 22    single-event dose be given only once per day?
09:47:41 23    A.    No, there's nothing there about frequency of dosing.
09:47:46 24    Q.    And in fact, if you go to the '793 patent Column 8,
09:47:53 25    lines 1, 2 what is the description there?
```

```
09:48:01  1   A.      Column 8 lines 12.  Treprostinil can be administered
09:48:20  2   a single time per day or several times per day.
09:48:30  3   Q.      What is the half-life of Treprostinil?
09:48:32  4   A.      Terminal half-life is about just shy of four and a
09:48:36  5   half hours.
09:48:36  6   Q.      And is Treprostinil typically used for the long-term
09:48:39  7   treatment of pulmonary hypertension patients?
09:48:41  8   A.      It is, yes.
09:48:44  9   Q.      So, you would understand that Treprostinil could be
09:48:48 10   used multiple times a day for these patients; right?
09:48:51 11   A.      Yes.
09:48:52 12   Q.      All right.  I have no further questions.  Thank you.
09:48:54 13                THE COURT:  All right.  Doctor, did you and
09:48:58 14   Dr. Hill, the defendant's expert, have a lot of professional
09:49:03 15   interactions?
09:49:04 16                THE WITNESS:  I guess it depends how you define
09:49:08 17   a lot.  We certainly interact professionally, yes.
09:49:12 18                THE COURT:  And you weren't here yesterday;
09:49:14 19   right?
09:49:14 20                THE WITNESS:  I was in the cath lab yesterday.
09:49:18 21                THE COURT:  Yeah, so, did you -- did your -- did
09:49:20 22   you read the transcript of Dr. Hill's testimony yesterday?
09:49:23 23                THE WITNESS:  I did, yes.
09:49:24 24                THE COURT:  And in terms of his medical opinions
09:49:27 25   that he gave during that, was there anything that you saw in
```

09:49:32  1  there that you disagreed with?
09:49:33  2          THE WITNESS:  I -- I thought -- I think the --
09:49:41  3  well, from a medical opinion, it seemed like most of the
09:49:44  4  opinions were really related to what we're talking about
09:49:46  5  here, not strictly applicable to clinical practice.
09:49:49  6          THE COURT:  Well, and, really, that's it
09:49:51  7  because, you know, doctors testifying about legal things is
09:49:57  8  kind of outside your area of expertise.  And the things that
09:50:01  9  are in your area of expertise, did you see anything that he
09:50:04 10  said that you disagreed with?
09:50:06 11          THE WITNESS:  No.  I -- I mean, we clearly
09:50:07 12  agreed on postcapillary disease as something we wouldn't be
09:50:10 13  treating with a pulmonary vasodilator.  I think we agreed
09:50:14 14  that there was room for treatment in patients with combined
09:50:18 15  pre- and post-capillary disease.  I think it's just a matter
09:50:22 16  of the patient at the time.  So, I would say we -- it looked
09:50:28 17  to me like we agreed from the standpoint of medical opinion,
09:50:32 18  yeah.
09:50:32 19          THE COURT:  All right.  Thank you.
09:50:34 20          You're done.  You can step down.  Watch your
09:50:36 21  step.
09:50:37 22          THE WITNESS:  Thank you.  Should I take these
09:50:39 23  binders?
09:50:40 24          THE COURT:  No, leave the binders.  They'll take
09:50:42 25  care of them.

09:50:43 1          THE WITNESS: Okay. Thank you.

09:51:14 2          MR. DAVIES: Your Honor, Defendants call
09:51:18 3 Nicholas Hill.

09:51:18 4          THE COURT: All right. So, Dr. Hill, you're
09:51:39 5 still sworn from yesterday, so you can just sit down. All
09:51:41 6 right.

09:51:41 7          THE WITNESS: Oh. Thank you.

09:51:47 8          THE COURT: And before Mr. Davies begins,
09:51:50 9 Dr. Hill, you heard the questions I just asked your opponent
09:51:54 10 in this case; right?

09:51:55 11          THE WITNESS: Yes.

09:51:57 12          THE COURT: Did you hear him give any medical
09:52:00 13 testimony that you disagree with?

09:52:03 14          THE WITNESS: Well, I think our view of
09:52:05 15 treatment of pre- and post-capillary pulmonary hypertension
09:52:09 16 is a little bit different. I did say that there's a
09:52:12 17 rationale for doing -- for treating that group, but I -- I'm
09:52:18 18 a little more concerned about the safety concerns that I
09:52:22 19 raised yesterday, particularly the danger of inducing
09:52:27 20 pulmonary hypertension. And so, I think we don't have
09:52:33 21 enough evidence in that group to justify saying, well, we
09:52:38 22 should just go ahead and treat with these pulmonary
09:52:43 23 hypertension-specific drugs that are available. And in
09:52:45 24 fact, none have been approved to date to treat the -- that
09:52:52 25 entity. So they don't seem yet to be as responsive to these

| | |
|---|---|
| 10:15:16 1 | patients? |
| 10:15:16 2 | A. They were healthy subjects. |
| 10:15:20 3 | Q. In your opinion, what would a clinician conclude |
| 10:15:23 4 | about therapeutically effective -- let me try that again. |
| 10:15:26 5 | Strike that. |
| 10:15:27 6 | In your opinion, what would a clinician conclude |
| 10:15:30 7 | about therapeutic effectiveness of Liquidia's 861 product |
| 10:15:34 8 | from this study? |
| 10:15:37 9 | A. I don't think you can conclude anything about the |
| 10:15:41 10 | therapeutic effectiveness from the study. |
| 10:15:45 11 | MR. DAVIES: Your Honor, I have no further |
| 10:15:46 12 | questions at this time. |
| 10:15:47 13 | THE COURT: All right. Well, let's take the |
| 10:15:49 14 | morning break of ten minutes. So, we'll be back shortly. |
| 10:15:57 15 | DEPUTY CLERK: All rise. |
| 10:16:07 16 | (Recess was taken.) |
| 10:28:52 17 | DEPUTY CLERK: All rise. |
| 10:28:58 18 | THE COURT: All right. Let's resume here. |
| 10:29:01 19 | Cross-examination. |
| 10:29:01 20 | CROSS-EXAMINATION |
| 10:29:04 21 | MR. JACKSON: Good morning, Your Honor. |
| 10:29:05 22 | THE COURT: Good morning. |
| 10:29:06 23 | BY MR. JACKSON: |
| 10:29:07 24 | Q. Good morning, Dr. Hill. |
| 10:29:08 25 | A. Good morning, Mr. Jackson. |

| | | |
|---|---|---|
| 10:35:36 | 1 | MR. DAVIES: No objection, Your Honor. |
| 10:35:37 | 2 | THE COURT: Admitted without objection. |
| 10:35:39 | 3 | (PTX Exhibit No. 59 was admitted into evidence.) |
| 10:35:39 | 4 | BY MR. JACKSON: |

10:35:40  5   Q.    And you agree that the primary efficacy purpose of
10:35:42  6   this study was -- for LIQ861 -- was to assess the
10:35:50  7   hemodynamic parameters; correct?
10:35:51  8   A.    That's correct.
10:35:55  9   Q.    Now, you agree with me that as of 2006, a person of
10:36:01 10   ordinary skill would have known that the half-life of
10:36:02 11   Treprostinil in the body was roughly three to four hours;
10:36:06 12   correct?
10:36:06 13   A.    That's correct.
10:36:08 14   Q.    And you agree with me that you would not be able to
10:36:11 15   dose somebody once a day with Treprostinil as a result;
10:36:15 16   correct?
10:36:15 17   A.    To apply a therapy over time, yes.
10:36:22 18   Q.    Okay.  So, all things being equal, would you expect
10:36:26 19   that you'd be able to dose somebody once a day with an
10:36:29 20   active ingredient that has a three- to four-hour half-life?
10:36:33 21   A.    It would not be a once-a-day therapeutic agent.
10:36:38 22   Q.    So you have to dose probably somewhere between three
10:36:40 23   and four times a day; right?
10:36:42 24   A.    That's about right.
10:36:44 25   Q.    Now, let's turn for a minute to the single-event